Isabel GONZALEZ, Individually and acting as Administrator of the Estate of Ippolito "Lee" Gonzalez and Louis Gonzalez and Elizabeth Gonzalez and Louis Gonzalez, Jr. and Marianne Mihalick and Christine Mihalick Derenzo

v.

Fred T. ANGELILLI and Patricia Azzura and Nicholas Muller and John J. Rice and James W. Riggs and Harold M. Shalon and Mary Ann Stewart and Martin F. Horn and Raymond P. McGinnis and Warden Donald Vaughn.

No. CIV. A. 98–CV–3537.

United States District Court, E.D. Pennsylvania.

March 5, 1999.

---

Mark B. Frost, Gregg L. Zeff, Frost & Zeff, Philadelphia, PA, for Plaintiffs.

Sue Ann Unger, Chief Deputy General, Chief Litigation Section, Office of Atty. General, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

Defendants have filed a motion to dismiss this civil rights action for failure to state a claim upon which relief may be granted for failure to train and under the "state created danger" theory of liability.[1] For the reasons which follow, we grant defendants' motion and dismiss this action in its entirety.

### History of the Case

This case tragically arose on the night of May 6, 1995 when Ippolito "Lee" Gonzalez, a Franklin Township, NJ police officer, was shot and killed during a routine traffic stop by one Robert "Mudman" Simon, a longtime member of the "Warlocks" motorcycle gang and a recent parolee from the Pennsylvania prison system. With the permission of the parole and prison authorities in Pennsylvania and New Jersey, Mr. Simon had relocated to Williamstown, NJ upon his release from the State Correctional Institution at Graterford, PA.[2] Plaintiffs are Officer Gonzalez' brother and sister-in-law, his niece and nephew and the owners of the Williamstown trailer park to which Simon had moved upon his prison release.[3]

Plaintiffs contend that Defendants, who are alleged to be the policy-making officials of the Pennsylvania Board of Probation and Parole ("PBP & P"), the Pennsylvania Department of Corrections ("PDOC") and the Warden of the State Correctional Institution at Graterford ("SCI–Graterford"), knew or should have known, *inter alia:*

---

1. Plaintiffs' complaint also includes claims for conspiracy and for violations of 42 U.S.C. § 1985. As reflected at page 3 of their Brief in Opposition to Defendants' Motion to Dismiss, Plaintiffs have conceded that Count IV of the complaint, raising these claims is properly dismissed and that Marianne Mihalick and Christine Mihalick Derenzo are barred by the statute of limitations from raising a failure to train claim. Accordingly, those claims are dismissed without further discussion.

2. Simon has since been convicted of murdering Officer Gonzalez, and Charles "Shovel" Staples, a fellow Warlock gang member who was driving the car at the time of the murder and who was instrumental in securing Simon a trailer in the Mihalick's park, was convicted of numerous offenses related to Officer Gonzalez' murder. (Pl's Complaint, ¶¶ 79, 80).

3. Plaintiffs' claims had originally been filed in two separate actions in the United States District Court for the District of New Jersey. By Order of June 29, 1998, however, the defendants, all of whom are residents of Pennsylvania, were dismissed from those suits on the grounds that they had insufficient contacts with New Jersey to justify the exercise by that court of jurisdiction over them. In so doing, Judge Simandle granted plaintiffs leave to file suit in this court. (Pl's Complaint, ¶ 4).

(1) that the policies, practices, procedures and customs of their agencies were inherently deficient, insufficient and dangerous to the public in that they permitted violent, unrehabilitated and dangerous criminals to be released from prison prior to the expiration of their sentences and that violent criminals who were released early from their sentences continued their violent criminal behavior including homicides, upon release (Pl's Complaint, ¶¶ 18–23);

(2) that Warlock motorcycle gang members had a propensity toward violence, particularly toward police officers and that improperly paroled Warlocks had committed violent crimes, including murder, upon parole (Pl's Complaint, ¶¶ 24–28);

(3) that Robert Simon was especially dangerous, in light of his psychological profile (psychopath), his prior criminal history (convicted of murder of young woman who refused to be gang raped by Warlock members, suspected of murdering another inmate, 49 misconducts during incarceration, drug use and drug sales), his continued affiliation with the Warlocks and continued drug use, and the opinion of his sentencing judge that he was one of the most dangerous individuals he had ever seen, had no respect for human life and that it would only be a matter of time before he killed again, (Pl's Complaint, ¶¶ 29–41).

It is thus the thrust of the Gonzalez Plaintiffs' complaint that in authorizing Simon's release and permitting him to take up residence in Williamstown, NJ, "[d]efendants created a specific danger to Plaintiff/Decedent and all police officers in and around Monroe and Franklin Townships ...", while the Mihalick Plaintiffs aver that they were "placed in danger by allowing Simon's parole and by failing to properly inform [them] of [his] violent history." (Pl's Complaint, ¶¶ 100, 120).

### Standards Governing Rule 12(b)(6) Motions to Dismiss

It has long been held that in reviewing a motion to dismiss for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6), the court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record and must accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn after construing them in the light most favorable to the non-movant. *Pearson v. Miller,* 988 F.Supp. 848, 852 (M.D.Pa.1997), *citing, Jordan v. Fox, Rothschild, O'Brien and Frankel,* 20 F.3d 1250, 1261 (3rd Cir.1994). The court need not, however, credit a complaint's bald assertions or legal conclusions. *In Re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1429–1430 (3rd Cir. 1997), *citing Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996). Dismissal is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved. *Alexander v. Whitman,* 114 F.3d 1392, 1398 (3rd Cir.1997).

### *Discussion*

### A. Plaintiffs' State–Created Danger Claims.

Although as a general rule, the state has no affirmative obligation to protect its citizens from the violent acts of private individuals, the courts have recognized two exceptions to this rule. *Morse v. Lower Merion School District,* 132 F.3d 902, 907 (3rd Cir.1997), *citing D.R. v. Middle Bucks Area Vocational Tech. Sch.,* 972 F.2d 1364, 1369–73 (3rd Cir.1992) (en banc), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996). Thus, liability can arise under Section 1983 for acts committed by a private citizen if: (1) the danger or risk of harm which led to plaintiff's injury was created by the state (the state created danger exception); or (2) the state entered into a special relationship with the plaintiff under which it assumed a duty to

ensure plaintiff's continued well-being (the special relationship exception). *Pearson v. Miller, supra,* 988 F.Supp. at 853.

■ The special relationship doctrine has long been recognized as imposing a duty upon state actors to protect and provide incarcerated prisoners, involuntarily committed mental patients and similarly situated others with adequate food, shelter, clothing and medical care given that they have been deprived not only of their liberty but also of the ability to care for themselves. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 198–199, 109 S.Ct. 998, 1004–1005, 103 L.Ed.2d 249 (1989). The affirmative duty to act under this doctrine arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf. *Id.,* 489 U.S. at 200, 109 S.Ct. at 1005–1006, *citing Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). *See Also: Horton v. Flenory,* 889 F.2d 454 (3rd Cir.1989). Indeed, in the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf through incarceration, institutionalization or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means. *Id.*

■ The state-created danger exception is essentially an outgrowth of the special relationship doctrine in that the threshold requirement is that there must be some affirmative action on the part of the state before liability may be imposed on the state or one of its actors. *See: DeShaney,* 109 S.Ct. at 1007–1008. In *Mark v. Borough of Hatboro,* 51 F.3d 1137 (3rd Cir. 1995), the Third Circuit observed that those cases from those circuits which had recognized the state-created danger theory as a vehicle for recovery under § 1983 had

four things in common: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. *Id.,* at 1152. Thus, the *Mark* court noted, "[t]he cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury." 51 F.3d at 1153.

It was not until 1996 in *Kneipp v. Tedder,* 95 F.3d 1199 (3rd Cir.1996) that the Third Circuit formally recognized the state-created danger theory as stating a viable § 1983 cause of action. In doing so, the Court applied the *Mark* four-part test and found that a triable issue of fact existed as to whether the defendant police officers had violated the wife-plaintiff's Fourteenth Amendment right to substantive due process when, despite her severely intoxicated state, they released her to return home alone after having earlier allowed her husband to leave the scene. Prior to her detention by the police for public drunkenness and disturbing the peace, Mrs. Kniepp's husband had been carrying her home as she was too inebriated to walk on her own. Applying the preceding four factors, the Third Circuit found that it was indeed foreseeable that plaintiff would suffer serious injury if left to return home on her own and that in interfering with Mr. Kniepp's efforts to take his wife home, the police could be found to have sufficiently "created" a danger for Mrs. Kniepp that a jury could hold the city and its police officers liable.

Since the *Kneipp* decision, numerous courts in this circuit have applied the state-created danger theory and in the process, have further refined it and the circumstances under which it is to be ap-

plied. Indeed, in addition to the above four factors, a plaintiff must allege and prove that the state acted with deliberate indifference. Further, the risk created must be particular to the individual plaintiff himself in addition to being foreseeable. *Morse, supra,* 132 F.3d at 910, 912, n. 11; *Pearson,* also *supra,* 988 F.Supp. at 853. Merely creating a situation which exposed the public in general to an obvious hazard or risk of harm is not enough. *Pearson,* 988 F.Supp. at 853, quoting *Morse,* 132 F.3d at 913, n. 12; *Doe v. Methacton · School District,* 880 F.Supp. 380, 386 (E.D.Pa.1995). *See Also: Martinez v. State of California,* 444 U.S. 277, 285–286, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); *DiJoseph v. City of Philadelphia,* 953 F.Supp. 602, 610–611 (E.D.Pa.1997); *Sciotto v. Marple Newtown School District,* 1999 WL 79136 (E.D.Pa.1999) at \*4.

■ Applying these factors to the plaintiffs' complaint in this case, we find that the plaintiffs simply cannot make out a cause of action under this theory. As regards foreseeability, plaintiffs contend "... that it is highly foreseeable that the release of an outlaw motorcycle gang member known to be a violent murderer with specific animosity toward law enforcement would kill a local police officer in a Warlock infested area."[4] This argument, which appears to be limited to the Gonzalez plaintiffs, is flawed in several ways.

For one, regardless of the allegations regarding the violent propensities of Warlocks in general and of Robert Simon in particular, plaintiffs nowhere allege that Simon himself had ever previously threatened, harmed or evinced any specific malevolence toward any police officer prior to May, 1995, let alone toward Officer Gonzalez himself. While there are indeed ample allegations and evidence that Mr. Simon is a violent and depraved individual, there is simply nothing to suggest that his violent proclivities were specifically directed at either Officer Gonzalez or even to police

officers in general in Monroe and Franklin Townships such that the defendants could have been expected to foresee that Officer Gonzalez would be killed as he was.

As far as the Mihalick plaintiffs are concerned, there are absolutely no averments which suggest that the destruction of their property by New Jersey law enforcement officers looking for evidence against Simon after the murder was the foreseeable result of defendants' approval of his release from prison. Thus, the foreseeability and directness requirements are not satisfied here.

Similarly, the complaint is lacking with respect to the second *Mark/Kneipp* factor—that of deliberate indifference for the safety of the plaintiff. Again, while the complaint is replete with allegations concerning Robert Simon's criminal history, psychopathic personality and violent proclivities, there is no evidence that these defendants knew of plaintiffs and plaintiffs' decedent, knew or somehow should have known that plaintiffs would come in contact with Simon or suffer injury at his hands, or that the policies and procedures which they allegedly promulgated would facilitate this contact and harm such that they could be said to have willfully disregarded or been deliberately indifferent to a known risk.

There is likewise no evidence that any relationship existed between plaintiffs and defendants which could give rise to a duty of care on defendants' part. As before, there are no averments that defendants had any contact with or even knew of plaintiffs' existence or that defendants exercised the requisite degree of control over the plaintiffs or plaintiffs' decedent to give rise to a relationship. There is also no evidence and there are no allegations upon which a jury could find that the plaintiffs were taken outside of the realm of the general public with respect to the duties owed them by defendants or that the de-

---

**4.** See ¶¶ 96–104 of Plaintiffs' Complaint and pages 19–20 of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

fendants' conduct measurably increased the risk of danger to these plaintiffs in particular. *Pearson,* 988 F.Supp. at 854, *citing, inter alia, Mark,* 51 F.3d at 1140–53; *Salas v. Carpenter,* 980 F.2d 299, 309 (5th Cir.1992); *Brown v. Grabowski,* 922 F.2d 1097 (3rd Cir.1990). Accordingly, we conclude that the third, relationship factor is also not present in this case.

Finally, there is also nothing to suggest that the fourth element can be satisfied under the facts of the instant case. Missing from the plaintiffs' complaint are allegations demonstrating a proximate link between the defendants' actions and Officer Gonzalez' murder. *Pearson,* 988 F.Supp. at 856 *citing Morse,* 132 F.3d at 907. Proximity is required in two respects: (1) geographic and (2) temporal. If either connection is too remote, i.e. if a long period of time elapsed between Simon's release or if Simon had lived at the Mihalick's trailer park for months or years before murdering Officer Gonzalez, the connection between the two is too attenuated and proximate cause is lacking. *Id.*

Here, while we must accept as true that defendants had and exercised supervisory authority over Simon in permitting his early prison release and that Simon would not have been in a position to shoot Officer Gonzalez had he not been paroled, this sequence of events does not mean that Gonzalez was killed and the Mihalicks' trailer park searched as the direct result of Simon's parole. *Morse,* 132 F.3d at 909. As the Third Circuit found in *Morse,* we too find that the causation is too attenuated and that the plaintiffs here will not be able to prove any set of facts which would provide the direct causal connection needed to satisfy this fourth part of the *Mark/ Kneipp* test.

We observe that this case is strikingly similar to that in *Martinez v. State of California, supra.* Plaintiffs there were the parents of a fifteen-year-old girl who was raped and murdered by a parolee five months after he was released from prison despite his history as a sex offender who brought suit under § 1983 against the state parole board and others charged with making parole release decisions. In affirming the trial court's dismissal of the suit, the Supreme Court noted:

> Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to the victim or to have proximately caused her death, we hold that taking these particular allegations as true, appellees did not "deprive" appellants' decedent of life within the meaning of the Fourteenth Amendment. Her life was taken by the parolee five months after his release. He was in no sense an agent of the parole board. Further the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law . . .

444 U.S. at 285, 100 S.Ct. at 559. Thus, in accordance with the rationale of *Martinez, Kneipp,* and *Mark,* we find that plaintiffs cannot state a cause of action under the state-created danger theory and that these claims are properly dismissed with prejudice.

**B. Plaintiffs' Failure to Train Claims.**

In Count III of their complaint, the plaintiffs assert a "failure to train" claim against all of the defendants. As noted previously in footnote 1 of this Memorandum, the Mihalick plaintiffs have conceded that their claims under the failure to train theory are barred by the statute of limitations and we therefore address only the Gonzalez plaintiffs' claim here.

The United States Supreme Court, in *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) held that there are limited circumstances in which an allegation of a "failure to train" can be the basis for liability under § 1983, but that inadequacy of training may only serve as the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employees come into contact. 489 U.S. at 387–388, 109 S.Ct. at 1204. As the *Canton* Court reasoned,

> The issue in a case such as this one is whether a training program is adequate, and if it is not, whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at 390, 109 S.Ct. at 1205. *See Also: Colburn v. Upper Darby Township,* 946 F.2d 1017, 1029–1030 (3rd Cir.1991); *Brown v. Smythe,* 780 F.Supp. 274, 282 (E.D.Pa.1991).

Similarly, in resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks that the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. *City of Canton,* 489 U.S. at 390–391, 109 S.Ct. at 1206. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training,

sufficient to equip him to avoid the particular injury-causing conduct since even adequately trained officers occasionally make mistakes. *Id.* Furthermore, for liability to attach, also requires that the identified deficiency in a city's training program must be closely related to the ultimate injury and thus it is still incumbent upon the plaintiff to prove that the deficiency in training actually caused his or her injury. *Id.*

In application of all of the foregoing to this case, we find that plaintiffs here have pled none of the elements necessary to state a claim upon which liability could be imposed against these defendants under a failure to train theory. Indeed, a review of Count III reveals that plaintiffs proffer nothing other than conclusory allegations that "[t]he defendants involved had in place at the time of Decedent's death, customs, policies and procedures were (sic) inherently defective and required more training, further training;" that "[p]olicy making officials and officials with authority knew that or should have known of the inappropriate policies but intentionally failed to take appropriate action and/or were deliberately indifferent to the consequences of their failure to take action;" and that "[a]s a result, Decedent's rights have been violated pursuant to 42 U.S.C. Section 1983, United States Constitution, New Jersey Constitution and other statutes and laws." (Pl's Complaint, ¶¶ 130–133).

Noticeably absent from the complaint, however, are any averments concerning what policies, procedures, etc. are defective, how they are defective or whether the complained-of policy, procedure, etc. in fact involves, a training program. Likewise absent are any allegations concerning in what manner the training program is defective, what employees are alleged to have acted improperly and how, what tasks those employees were charged with performing, and whether or how the need for more or different training was so obvious to defendants that they could be said

to have been deliberately indifferent to that need. Without these factual averments, there is no basis upon which this court can credit the bald assertions and legal conclusions which plaintiffs have set forth in Count III of their complaint. Count III must therefore be dismissed as well.

For all of the reasons set forth above, the defendants' motion to dismiss is granted with prejudice in accordance with the attached order.

## *ORDER*

AND NOW, this 10th day of March, 1999, upon consideration of the Defendants' Motion to Dismiss the Plaintiffs' Complaint and Plaintiffs' Response thereto, it is hereby ORDERED that the Motion is GRANTED and the Plaintiffs' Complaint is DISMISSED with prejudice for the reasons discussed in the preceding Memorandum Opinion.